# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 13, 2014 Session

## STEVEN JAMES McCAIN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 1998-D-2520      J. Randall Wyatt, Jr., Judge**

---

**No. M2013-00992-CCA-R3-PC - Filed July 23, 2014**

---

The petitioner, Steven James McCain, appeals the denial of his petition for post-conviction relief from his 1998 Davidson County Criminal Court jury convictions of two counts of first degree premeditated murder, claiming that the State withheld material evidence at trial and that he was denied the effective assistance of counsel at trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Steven James McCain.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Davidson County Criminal Court jury convicted the petitioner of two counts of first degree premeditated murder. The trial court imposed two consecutive life sentences, and this court affirmed the judgments on direct appeal. *See State v. Steven James McCain*, No. M2000-02989-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Nashville, May 22, 2002).

In *Steven James McCain*, this court summarized the facts of the case as follows:

> At trial, the State presented proof that, on April 25, 1998, the [petitioner] met Phillip Leslie at the home of a mutual

acquaintance, Sally Ann Smith. Leslie only knew the [petitioner] as "Steve." Leslie drank beer and played poker for a little while and then decided to leave Smith's residence. The [petitioner] asked Leslie to give him a ride home and Leslie agreed. On the way, Leslie stopped and purchased beer and cigarettes at an Exxon station. Also during the ride, the [petitioner] mentioned that he needed to use the telephone, so they went to the nearby home of Leslie's mother. While there, the [petitioner] spent considerable time on the telephone. Some time later, Leslie fell asleep. The [petitioner] revealed at trial that, during the course of his telephone calls, he discovered that a man named Reginald M. Conwell had taken some cocaine from Tina Bryant, a woman who was selling the cocaine for the [petitioner].

The next morning, Leslie awoke and found the [petitioner] asleep on the couch. He informed the [petitioner] that it was time to leave. The [petitioner] asked Leslie to take him to "see Fonzie," directing Leslie to 2312 Shadow Lane in Madison. Once they arrived at the residence, the [petitioner] retrieved his jacket from the rear portion of the extended cab of Leslie's truck. Leslie noticed that the [petitioner] was hiding a sawed-off .22 caliber rifle underneath the jacket. The [petitioner] walked toward the residence and instructed Leslie to follow him and to "watch his back." Leslie complied because "I've learnt that you don't argue with a man with a gun."

Conwell answered the door of the residence in response to the [petitioner]'s knock. The [petitioner] entered the residence and asked Conwell, "How come you got my sh**?" The two men started arguing. Leslie maintained at trial that another man, Malbourne Angiers, also known as "Twango," was laying on the couch asleep during the altercation. Conwell told the [petitioner], "Go ahead and pop a – pop a cap at me. I'm ready to die." After the statement, the [petitioner] shot Conwell four times with the rifle.

Leslie left the residence after the first shots were fired. He walked back to his truck, and, on the way, he heard several more shots fired. The [petitioner] exited the house and got in

Leslie's truck. Leslie asked the [petitioner] if he had killed anyone. The [petitioner] told Leslie that, "I had to kill – I killed them both. I had to." The [petitioner] further ordered Leslie not to "snitch him out" or the [petitioner] would kill Leslie and burn his mother's house.

The [petitioner] instructed Leslie to drop him off in front of a "large, white brick house" at 151 Oak Valley Drive. The [petitioner] exited the truck with the gun under his coat and walked toward the rear of the house. Leslie left and returned to his mother's house. Over the course of the next one or two hours, he drank approximately twelve beers. However, Leslie asserted that he did not become intoxicated by the alcohol. Leslie then called the police and informed them that he may have witnessed a murder.

*State v. Steven James McCain*, slip op. at 1-2 (footnotes omitted).

Melinda Daugherty testified at trial that she, along with three others, visited 2312 Shadow Lane on April 26, 1998 to "'see who all was there and to use the phone.'" *Id.* at 3. Shortly after entering the house, Ms. Daugherty contacted 9-1-1 and "notified the authorities that Conwell was dead and Angiers needed medical attention. Angiers died approximately twenty-one hours after the shooting." *Id.*

Metro Detective Brad Putnam testified that he interviewed Mr. Leslie and recorded his statement. *Id.* Detective Putnam also provided Mr. Leslie with a photographic lineup, "but Leslie was unable to identify anyone in that lineup as the perpetrator." *Id.* Mr. Leslie did, however, inform Detective Putnam that the petitioner had been in his vehicle earlier that day, and fingerprints obtained from Mr. Leslie's truck matched those of the petitioner. *Id.* Law enforcement officers also spoke with Wanda Key, who resided at 151 Oak Valley Drive, and she told officers that her sons, one of whom was Jamal Cooper, had a friend by the name of Steven McCain. *Id.* Using this information, Detective Putnam compiled a new photographic lineup which included the petitioner's photograph. *Id.* When Detective Putnam showed the new lineup to Mr. Leslie, Mr. Leslie "'almost immediately' identified the [petitioner] as the perpetrator." *Id.* The murder weapon was later discovered in a crawl space behind Ms. Key's residence at 151 Oak Valley Drive. *Id.*

The [petitioner] testified that at the time of the offense he was on parole for aggravated robbery. He admitted that, upon his release from incarceration, selling cocaine was his primary

source of income. The [petitioner] claimed that, on April 25, 1998, he and Leslie were at Smith's house. He asked Leslie to drive him around to make drug sales, and in return the [petitioner] promised to give Leslie cocaine. The [petitioner] maintained that Leslie agreed and took the [petitioner] to several addresses, including the house at 151 Oak Valley Drive. The [petitioner] alleged that Leslie used cocaine on several occasions that night. According to the [petitioner], he and Leslie went to Leslie's mother's house so the [petitioner] could use the telephone. The [petitioner] related that Bryant called and "told me that Reggie Conwell has took the drugs that I had gave to her . . . . I asked her why did he take it and where was he at?" Later that night, Conwell talked to the [petitioner] and acknowledged that the cocaine he had taken from Bryant belonged to the [petitioner], stating that he would pay for the cocaine and buy additional cocaine from the [petitioner] the next morning.

According to the [petitioner], he and Leslie slept until daybreak and then went to 2312 Shadow Lane. The [petitioner] alleged that Conwell paid for the cocaine obtained the night before and bought more cocaine from the [petitioner]. For no apparent reason, Conwell then became enraged. The [petitioner] noticed a sawed-off .22 caliber rifle on the loveseat in the living room of Conwell's house. The [petitioner] said that, when Conwell moved toward the gun, the [petitioner] also moved for the gun and grabbed it first. At this point, Leslie exited the house, and the [petitioner] turned to see what was happening. While his head was turned, Conwell lunged toward the [petitioner], and, in reaction, the [petitioner] fired at Conwell. The [petitioner] then dropped the gun and fled. The [petitioner] admitted that he told Leslie that he had killed Conwell but asserted at trial that he was not sure that Conwell was dead when he left the residence. The [petitioner] denied that there was anyone else in the house at the time of the shooting.

The [petitioner] maintained that he instructed Leslie to leave him near a bowling alley on Oak Valley Drive because he did not want Leslie to know where he was going. The [petitioner] walked to 151 Oak Valley Drive, woke Jamal Cooper, and Cooper drove the [petitioner] to "Auntie's." From

-4-

there, the [petitioner] attended the funeral of a family member. A few hours later, the [petitioner] learned that the police were looking for him. He fled to Alabama where he was later discovered by officers with the Athens, Alabama Police Department. The [petitioner] gave a brief statement to the Alabama police before being picked up by Metro officers.

In further support of his defense, the [petitioner] called Chad Collins as a witness at trial. Collins maintained that, on a night in May after the shooting, he was with Leslie in Leslie's truck. Collins alleged that Leslie became "teary-eyed" and confessed to dropping off the [petitioner], returning to 2312 Shadow Lane for the cocaine, and therein killing the two men. In rebuttal, the State presented a previously taped statement of Collins in order to impeach parts of his testimony. The detective who took Collins' statement agreed that, at the time Collins made the statement, Collins "was either really tired or on something."

*Id.* at 3-4.

On May 20, 2003,[1] the petitioner filed, pro se, his initial petition for post-conviction relief. Over the following seven years, at least six attorneys were appointed to represent the petitioner, and at least five of those attorneys moved the court to withdraw as petitioner's counsel. One of those attorneys filed an amended petition for post-conviction relief two months before seeking to be relieved from the petitioner's case. On July 16, 2012, the petitioner filed, pro se, a supplemental amendment to his petition for post-conviction relief. Following the apparent appointment of new counsel,[2] the post-conviction court conducted an evidentiary hearing on January 29, 2013.

Officer Scott Murrell with the Metro Nashville Police Department ("Metro") testified that, on April 26, 1998, he responded to the crime scene and interviewed one of Mr. Conwell's neighbors, Elizabeth Feltz. The report Officer Murrell prepared on April 26

---

[1]The file-stamp date on the petition for post-conviction relief is illegible. In its order denying post-conviction relief, the post-conviction court states that the petition was filed on May 20, 2003, and we will rely on that date.

[2]The petitioner was represented by new counsel at the post-conviction hearing, although an order appointing counsel does not appear in the record.

following his interview with Ms. Feltz was introduced into evidence and provided as follows:

> Officer S. Murrell interviewed Mrs. Elizabeth Felts [sic] at 2310 Shadow Lane. Witness states that she heard a loud commotion around 0600 hrs. Witness states that she observed a female white outside the victim[']s residence arguing with some subjects inside the residence. Witness also observed several vehicle[s] leave the residence after 0600 hrs. An older model Chevy truck DARK BLUE over light blue, a newer model Chevy truck tan in color with a black male and white male inside and TAN Chevy car.

> Officer S. Murrell went to 1640 Neels [sic] Bend to check on a Lisa Long. A car belonging to this subject, gray Chevette, was found parked in the victim[']s driveway. The residents at this address state that Lisa Long is their granddaughter but that she had not been home since yesterday afternoon. The grandparents, Mr. Beckrath agreed to let officers look through the house for Lisa Long. The subject could not be found at the residence.

The petitioner introduced into evidence a supplemental report prepared by Metro Detective Juan Borges, which provided as follows:

> On 04/26/98 I was dispatched to 2312 Shadow Lane on a shooting that occurred at about 0600 hrs; Detective J. Lawrence and Detective F. Pierce also arrived at the scene. Upon arrival I went inside the house and saw a male black laying face down on the kitchen floor. There was blood on the couch, carpet, and kitchen area. Det Pierce notified the chain of command and the murder squad was called out. Det B Putnam arrived at the scene and took charge. I then went to 2310 Shadow Lane and talked to Mr Bobby Feltz and his wife Ms Elizabeth Feltz. They stated that at about 0600 hrs; a female was bangin [sic] on the door at 2312 Shadow Lane and was saying "Give me my purse back." When the people in the house did not let her back in, she went to the house across the street, but no one answer [sic] the door she then went back to the house and was trying to get inside. The witness lost sight of her and was unable to see were [sic] the female went to. At about 0700

-6-

hrs; a 1985 Chevy pulled in the drive way with one male black driving. He got out of the vehicle with what appeared to be grocery bags and went inside the house. At about 0730 hrs, a two tone blue Chevy pick up truck older model pulled in front of the house it also had a white top. The driver was a white male. Few minutes later a black male heavy set got inside the truck and, then drove off. A little later another car pulled in it was a small tan size vehicle. Inside that car was a white male and a white female few minutes later a white female got inside the car and drove off. About 20 minutes later a new pick up truck arrived at the scene a big white male was driving the truck and another white male with a green shirt was in the passenger side. The witness then did not pay much attention after that.

The petitioner testified that "six or seven" attorneys had been appointed to handle his case and that he rarely saw any of his attorneys. When asked if the decision to testify at his own trial was a joint decision between the petitioner and trial counsel, the petitioner responded that his "lawyer said [he] needed to testify." The petitioner also stated that trial counsel had advised him to admit, during the course of his trial testimony, that he was a drug dealer and that he failed to aid Mr. Conwell after the shooting because the petitioner was on parole at the time. The petitioner testified that he had requested that trial counsel interview witnesses Jamal Cooper and Shannon Cagle. According to the petitioner, Mr. Cagle would have testified that, when the petitioner arrived at Sally Smith's house on April 25, 1998, the petitioner had neither a gun nor a coat under which he could have concealed such a weapon. The petitioner stated that Mr. Cagle had "patted [him] down" upon entering Ms. Smith's house and that Mr. Cagle would therefore have noticed a handgun and a coat. The petitioner further stated that Mr. Cooper would have testified that, when he dropped the petitioner off at Ms. Smith's residence, the petitioner had neither a gun nor a coat. The petitioner testified that the testimony of Mr. Cagle and Mr. Cooper would have been important to his case because "it takes the murder weapon out of my hand, it at least tends to lessen the charge."

With respect to the police reports prepared by Officer Murrell and Detective Borges, the petitioner testified that "the significance . . . is that [the reports] . . . described exactly who came, came and left." In examining Officer Murrell's report, the petitioner explained its significance as follows:

> [I]t gives an order who came and gone and they describe a
> newer model truck, Chevy truck, tan in color with a black man
> and a white man inside, which would be me and Phillip Leslie.

-7-

. . . Then it states that a tan Chevy car came, then the second report states who was in this small tan Chevy car which was the husband, and the husband states that, uh, inside the car was a white male and a white female. A few minutes later the white female got inside the car and left. What the significance of that is, is that I've always said that Mr. Angiers was not in that house when I was in that house.

The next door neighbors say that me and Phillip Leslie was at this house, left, and then a tan car containing a white female and a man and then the female leaves which has to be [Mr. Angiers]. Then, 20 minutes later a new model pick-up truck arrived at the scene with a big white male driving and another white male with a green t-shirt on the passenger side, which would mean that Phillip Leslie came back to the scene of the crime without me.

The petitioner stated that these two police reports corroborated the trial testimony of Chad Collins, who testified that Mr. Leslie admitted to returning to the Shadow Lane residence and killing both Mr. Conwell and Mr. Angiers. The petitioner complained that neither of the neighbors who provided the information contained in those police reports was called as a witness at trial.

The petitioner also claimed that trial counsel failed to advance the argument at trial that information contained within the autopsy report was inconsistent with the facts as presented by the State. The petitioner testified that, according to the State, Mr. Conwell had been shot in the back, but the crime scene photographs and the autopsy report indicated that Mr. Conwell "was shot three different angles from three different places in the house."

On cross-examination, the petitioner acknowledged that he had admitted at trial to shooting Mr. Conwell, although the petitioner denied killing Mr. Conwell. The petitioner conceded that the sawed-off .22 caliber rifle he used to shoot Mr. Conwell was the same weapon that was used to kill Mr. Angiers. With respect to the petitioner's claim that his occupation as a drug dealer was immaterial at trial, the petitioner admitted that the reason he visited the Shadow Lane residence on April 26 was his concern that Mr. Conwell had stolen some drugs that Ms. Bryant was selling at the petitioner's behest. The petitioner insisted that he asked trial counsel to interview witnesses Jamal Cooper and Shannon Cagle although he did not know why trial counsel had failed to comply with his request.

Trial Counsel One testified that, along with Trial Counsel Two and Trial

Counsel Three, he was appointed to represent the petitioner at trial. Counsel One could not specifically recall having previously seen the police reports of Officer Murrell and Detective Borges. After reviewing those reports, Counsel One admitted that the testimony of Mr. and Mrs. Feltz "would be certainly something that you would want to explore." On cross-examination, Counsel One testified that he and his co-counsel did their best in their representation of the petitioner, and he could not recall anything that he would have done differently. With respect to the defendant's decision to testify at trial, Counsel One stated that he and his co-counsel would "obviously give our professional opinion" but that "it is very clear under the law that the decision whether a defendant testifies or not is the defendant's decision and we would cite that to the defendant in an almost, well, in every case where it went to trial and that would be their decision."

Trial Counsel Two testified that she did not recall having seen the two police reports at issue prior to trial, and she agreed that, in light of the testimony of Chad Collins, the police reports "would have been helpful" and that Mr. and Mrs. Feltz "would have been witnesses that we would have wanted to pursue, interview, and potentially call." On cross-examination, Counsel Two agreed that she was the attorney who conducted the petitioner's direct examination at trial, and, although she could not recall with any specificity, she believed that she would have advised the petitioner to testify at trial so that he could get "his defense out there." Counsel Two denied that she would have told the petitioner what to say at trial but stated that she would have advised him to tell the truth.

Trial Counsel Three testified that she had no recollection of reviewing the police reports at issue prior to trial. Counsel Three stated that she and Counsel Two had "a reputation of turning over every stone," so she believed they would have asked their investigator to interview Mr. and Mrs. Feltz. She admitted that, after reviewing the investigator's file, nothing indicated that the Feltzes had ever been interviewed. Counsel Three agreed that testimony "as far as other people coming and going [from the Shadow Lane residence] after [the petitioner] had supposedly left, might have been helpful in creating a reasonable doubt as to his guilt." On cross-examination, Counsel Three identified for the jury two motions for exculpatory evidence that she and her co-counsel filed on behalf of the petitioner prior to trial.

Jamal Cooper testified that he and the petitioner had been friends since childhood. Mr. Cooper stated that he did not recall that anyone had ever contacted him or interviewed him in connection with the petitioner's trial. Mr. Cooper testified that he drove the petitioner to Ms. Smith's house on April 25 and that the petitioner was not wearing a coat because it "was warm outside." Mr. Cooper denied seeing the petitioner with a weapon of any kind, and he confirmed that he had been willing to testify at the petitioner's trial if he had been asked. On cross-examination, Mr. Cooper admitted that he had a pending homicide

charge at the time of the petitioner's trial.

Assistant District Attorney General Katrin Miller testified that nothing in her files indicated that Mr. Collins had told investigators that Mr. Leslie had killed the two victims. General Miller stated that the State had filed a discovery response prior to trial and that the two police reports at issue were apparently included in that file although she could not recall having seen the reports until the post-conviction hearing. She agreed, however, that without the knowledge of Mr. Collins' planned testimony, the reports would not have appeared to have been exculpatory to the defendant.

Court Clerk Barbara Wise testified that she had reviewed the court's file which contained the State's discovery responses, but she did not find either of the police reports included in that discovery.

In the post-conviction court's order denying post-conviction relief, the court found that trial counsel's failure to call Shannon Cagle and Jamal Cooper to testify at trial did not constitute deficient performance and that, in any event, the petitioner failed to establish prejudice. With respect to the petitioner's claim that trial counsel rendered ineffective assistance of counsel by advising the petitioner to admit being a drug dealer, the post-conviction court was "not convinced that trial counsel rendered such advice" but found that, even if counsel had so advised the petitioner, such advice "would have been well within the range of competence demanded of attorneys in criminal cases." In addition, the post-conviction court again found that the petitioner had failed to demonstrate prejudice and found that trial counsel "ultimately left the decision of whether and how to testify up to the [p]etitioner." Regarding the petitioner's claim that trial counsel advised him to admit at trial that he chose not to aid Mr. Conwell because the petitioner was on parole, the post-conviction court found that "the proof failed to establish that trial counsel rendered such advice and failed to establish the requisite prejudice." With respect to the petitioner's contention that the State withheld two police reports, the post-conviction court stated, "Assuming, without finding, that the [p]etitioner established the first three prerequisites [to establish a *Brady* violation], the Court finds that the [p]etitioner failed to establish that the police reports were material."

On appeal, the petitioner contends that the State withheld material evidence, violating the tenets of *Brady v. Maryland*, 373 U.S. 83 (1963), and that he was denied the effective assistance of counsel. We consider each claim in turn.

We view the petitioner's claims with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the

-10-

Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

## I. Brady Violations

The petitioner first contends that the State violated the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), when the State failed to provide the petitioner with copies of two police reports which allegedly contained exculpatory information. The State submits that the petitioner failed to demonstrate the materiality of the police reports, and, as such, the defendant could not establish a *Brady* violation.

The constitutional right to a fair trial imposes upon the State "duties consistent with the[] sovereign obligation to ensure 'that justice shall be done' in all criminal prosecutions." *Cone v. Bell*, 556 U.S. 449, 451 (2009) (quoting *United States v. Agurs*, 427 U.S. 97, 111 (1976) (citation and internal quotation marks omitted)). In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001) (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (appendix); *Johnson*, 38 S.W.3d at 56. *Brady* and its progeny create in the "individual prosecutor . . . a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

To prove a *Brady* violation, a defendant must demonstrate:

> (1) that he requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not),

(2) that the State suppressed the information,

(3) that the information was favorable to the defendant, and

(4) that the information was material.

*Johnson*, 38 S.W.3d at 56 (citing *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995); *Walker*, 910 S.W.2d at 389); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."). The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). Plainly stated, establishing materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see Johnson*, 38 S.W.3d at 58.

In the instant case, the petitioner's claim fails the test of materiality. Although the petitioner contends that the witness statements contained in the police reports support his theory of the crime, we conclude that the police reports are neutral at best. Officer Murrell's report indicates that Mrs. Feltz heard "a loud commotion" at 6:00 a.m. and observed a white female outside the victim's house arguing with people inside the residence. Mrs. Feltz also observed three vehicles leave the victim's residence after 6:00 a.m.: an older dark blue over light blue Chevrolet truck; a newer tan Chevrolet truck occupied by a black male and a white male; and a tan Chevrolet car. Detective Borges' report states that Mr. and Mrs. Feltz observed a white female pounding on the door of the victim's house at 6:00 a.m. and saying "Give me my purse back." When she was denied entry, the female proceeded to the house across the street. When no one answered the door, the female returned to the victim's house and attempted to enter. The Feltzes then lost sight of the female. At approximately 7:00

a.m., "a 1985 Chevy" driven by a black male arrived. The man walked into the victim's house carrying "what appeared to be grocery bags." Thirty minutes later, a white man driving a two-tone blue Chevrolet pick-up truck arrived, and, a few minutes later, a heavy-set black male "got inside the truck" and the truck "drove off." Shortly thereafter, a small tan vehicle arrived with a white male and white female, and, a few minutes later, "a white female got inside the car and drove off." Approximately 20 minutes later, "a new pick up truck arrived at the scene" driven by "a big white male" with "another white male with a green shirt" in the passenger seat.

At the post-conviction hearing, the petitioner claimed that the reports "described exactly who came . . . and left." We disagree. The petitioner contended that the newer tan Chevrolet truck with a black male and a white male inside "would be me and Phillip Leslie." The petitioner opined that the small tan Chevrolet vehicle containing a white man and a white woman with the white woman later driving away from the house somehow proved the petitioner's statement "that Mr. Angiers was not in that house when I was in that house." The petitioner then stated that the new pick-up truck that arrived on the scene with two white males "would mean that Phillip Leslie came back to the scene of the crime without me." The statements contained in these police reports simply do not provide the proof that the petitioner claims. From these reports, we cannot say how the comings and goings described by the Feltzes relate to the time of death of the victims, nor do we know for certain that the times described by the Feltzes are even accurate. Although the petitioner claims that the descriptions of gender, race, and automobile type provided by the Feltzes match certain key people and vehicles, we conclude that these vague descriptions offer little to advance the petitioner's theory. Moreover, this court in *Steven James McCain* noted, in assessing the sufficiency of the convicting evidence, that the medical examiner had "explained that all of the shots occurred within minutes." *Id.*, slip op. at 15. The petitioner admitted at trial that he had shot Mr. Conwell and claimed that he then had Mr. Leslie drop him off at the Oak Valley Drive residence. During the post-conviction hearing, the petitioner admitted that the weapon he used to shoot Mr. Conwell was the same weapon used to kill Mr. Angiers. The facts that all shots fired occurred within minutes, that all the shots came from the same weapon, and that the murder weapon was discovered in the crawl space of the residence where the petitioner asked Mr. Leslie to take him after the murders all drastically undermine the petitioner's theory that Mr. Leslie later returned to the crime scene and killed both men.

In our view, the proof of the petitioner's guilt was overwhelming, including, most importantly, the petitioner's own admission to shooting Mr. Conwell. Although each member of the petitioner's trial counsel team testified that the police reports contained information that they would have been interested in pursuing, none of the three attorneys expressed the belief that the statements of the Feltzes would have altered the outcome of the trial. Even if the petitioner could prove the other prerequisites, he failed to establish that the

-13-

police reports would have "undermine[d] confidence in the verdict." *Kyles*, 514 U.S. at 435. Because the petitioner did not prove materiality of the evidence, he has failed to establish a *Brady* violation.

## *II. Ineffective Assistance of Counsel*

The petitioner next contends that trial counsel were ineffective because they failed to interview Mr. and Mrs. Feltz, Shannon Cagle, and Jamal Cooper.

To establish entitlement to relief via a claim of ineffective assistance of counsel, the defendant must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the defendant fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goud v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the defendant the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the trial court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record supports the post-conviction court's denial of relief. With respect to counsel's failure to interview the Feltzes, nothing in the record indicates that trial counsel knew of the Feltzes' statements contained in the police reports, as discussed

-14-

previously in this opinion. Moreover, the petitioner has failed to show that he was prejudiced by counsel's alleged failure. The petitioner failed to present either of the Feltzes at the evidentiary hearing. As such, we cannot speculate what either witness might have testified to at trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Similarly, the petitioner did not call Shannon Cagle to testify at the post-conviction hearing, and, again, we cannot speculate about the substance of Mr. Cagle's nonexistent testimony. *See id.*

Furthermore, the petitioner failed to ask any of his three trial attorneys about the failure to call either Mr. Cagle or Jamal Cooper. As this court has stated, "[w]ithout counsel's testimony on this issue, we would be forced to speculate about the reasoning behind [counsel's] decision and whether any prejudice resulted from [counsel's] actions." *State v. Charles Edward Wagner*, No. E2012-01144-CCA-R3-CD, slip op. at 17 (Tenn. Crim. App., Knoxville, Jan. 8, 2014); *see also Fredrick Tucker v. State*, No. M2007-00681-CCA-R3-PC, slip op. at 5 (Tenn. Crim. App., Nashville, July 14, 2008) (stating that petitioner's failure to question trial counsel regarding alleged deficiencies in representation resulted in a failure to establish deficient performance). In any event, the petitioner failed to show that he was prejudiced by counsel's failure to call Mr. Cooper as a witness at trial. In his testimony at the post-conviction hearing, Mr. Cooper stated simply that the petitioner was not wearing a coat and that he did not see the petitioner in possession of a weapon when he left him at Ms. Smith's house hours before the murders were committed. These statements, even if true, in no way prove that the petitioner did not commit the crimes with which he was charged. As such, we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

### III. Conclusion

The petitioner failed to establish either a *Brady* violation or that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE